May it please the court. My name is Thomas Wolfram. I represent Elaine Murphy. Chief Judge Kuczynski, Judge McEwen, Judge Clifton, Mr. Sloan. This case is a clear case of wrongful removal and retention. From the child's standpoint, in June of 2016, this little girl left Ireland and her mother and her school and her dance, her Irish dance, for summer in the United States. And she was thinking that she would return at the end of August to Ireland, just as she had done after first grade. I'm sorry, you're telling us what's in the child's mind? Yes. Because this case has unique facts, Your Honor. Well, what's the legal issue before us? Yeah. The legal issue would include whether the district court's findings of facts were clearly erroneous. But what's the core question that you're asking us to decide? Well, there is clear error below. So that standard, I'd refer you to ER-136, ER-146, ER-101, which are the income and expense declarations of the parties exchanged on February 16, 2013 in Ireland. And the February 2013 marital settlement agreement proposed by Mr. Murphy – excuse me, by Mr. Sloan. Additionally – Wait, wait. This is February 13, 2014? 13. Oh, 13. And what number is that? Those are ER-101, 136, and 146. That's the settlement agreement. 136 and 146 are the California State Family Law Act forms for income and expense declaration information. On page 4, at paragraph 16, the form calls for the parents – I'm sorry. You had two forms. Which form? 136 or 146? Both. They're the same. They're the mirror forms, Your Honor. One is – 136, I believe, is from Mr. Sloan. 146 is from Ms. Murphy. In a California divorce proceeding, the parties – ER-136 starts with paragraph 16. Yes. So you said 4. I just want to make sure I'm looking at what you're pointing me to. Exhibit D. I'm sorry? Exhibit D is reproduced as ER-136. And if we look at paragraph 16 – I'm sorry, 16. I thought you said 4. It's page 4. This form has – It's fine. Paragraph 16. Go ahead. Yes. What does paragraph 16 do for you? And this is Mr. Sloan's February 2013. And remember, the removal, if you will, is in June of 2013. So February, March, April, May, four months later. Okay. 146 is – What does this do to help you? Okay. Here, Mr. Sloan is saying – I know what it does. What does it do to help you? How does it advance your point? I believe it is evidence of shared parental intent under your Moses decision, especially when read with hate. It's our Moses decision. Especially if you look also at ER-101. I'm sorry. Let me just make it clear. This does not talk geography. This talks parental custody. It does not say where each parent is or where the child will be or anything else. It just says where the – who – which parent the child will spend time with. And, Your Honor, that's why we turn to ER-101. Okay. Exhibit 39 at trial. Okay. And where on page 101 are you? At paragraph 3.2, joint custody, and paragraph 3.3, final custody order. Paragraph 3.2. Okay. Second line says – may I use the child's name or should I just refer to her as E? E or ES? That's what's in the record? ES, quote, Bill and Elaine will have joint physical custody of ES and will share time with E as much as possible, given that E will – and here's a key word – reside in Ireland with Elaine during the school year and in California with Bill during summers and holidays. I'd also like to direct your attention to the next paragraph, 3.3, in which Mr. Sloan refers to the California Supreme Court case of Montenegro v. Diaz. There is a controversy in the – or there's a decision in the California court – in fact, it's Montenegro v. Diaz – that if there is a final custody order, that order cannot merely be changed by a party convincing the trial court that there is – that it is in the child's best interest. When you make a final order, what you have to have, as I'll continue to read, which means that a party – excuse me – quote, which means that a party seeking to change the agreed-upon custody arrangement – And here we have an agreed-upon custody arrangement for school. For the future. This is a custody arrangement for after the divorce. I'm not sure how it speaks to what happened before. We know what the facts were when the child was present at one place. In the face of those facts, the district court concluded that the prior habitual residence had not been abandoned. So what's the point of telling us what the future custody arrangement is, which includes residence in both places? Well, it includes residence for 9 months or a little bit more than 9 months in Ireland. This is not a 50-50 shuttle case, as some of the cases that come up under the habitual residence are. The child will spend 6 months in one country and 6 months in another, Your Honor. This is a 9-month, plus 9 months, a little less than 3 months. Well, maybe a different way to ask it is where does – you point to this and this and this, but we're looking at a very extensive findings by the district court. So where did the district court go wrong? What is clearly erroneous? If you could point me to anything in the district court that's clearly erroneous, that would be helpful. Thank you for asking that question, because you are right. The district court wrote a long, detailed opinion that follows your decision of Moses. And I'd like to speak to that in a moment. Just answer Judge McKeown's question. Okay. The court – the district court did not mention these three exhibits in its opinion. And these are crucial opinions. These are crucial facts. The district judge said he reviewed all the materials submitted, all the affidavits. Is there any reason to doubt that he did that? He has a thorough – the district judge has a thorough discussion of the facts, clearly shows an understanding of what was in the record before him. And he also said, just to add to that, he said the date of dissolution, which was October 2013, and then he said, still pending are orders regarding custody support, child and spousal. So he – he references that. He does what? Do you have a final child custody order? I don't believe so. That's what I thought. So what you have is exactly what the district court said. You have a divorce or a dissolution, but as of the time of the district court order, you do not yet have a final child custody order. I mean, and so he had reviewed all the – he reviewed all the papers. He tells you you don't have a final order. So I'm not sure how somehow that document upends his entire decision. On this point, failure to mention ER-101, ER-136, and ER-146. What's so critical about those documents that the failure to mention them is such a glaring error? If we – it relates back to whether or not shared – last shared parental intent remains the standard in this district. Well, but these documents all pertain to the future. They're what is being proposed for custody after dissolution. The court's findings carefully recited when the child was at what place, and it's not inconsistent with this. But the child had spent most of the year in Ireland, and the district court got those facts correct. You're not complaining about any of those. So I'm not sure why the proposal for what's supposed to happen in the future changes the facts that the judge was looking at, such that the failure to mention those documents is so critical. Judge, ER-136 and ER-146 are not about the future. They are about the present and the past. Because in paragraph 16, both parents say the child has been with mother in Ireland for 70 percent of the time. But the judge has already said that in the findings of fact. What in the findings of fact is incorrect or fails to reflect what you just said? He's recited where she's been. The takeaway would be that in paragraph 3.2 of ER-101, father is showing his last parental intent that this child has been and is going to remain in Ireland during the school year. It's a question of this is evidence, ER-101, paragraphs 3.2 and 3.3 are circumstantial or direct evidence of father's intent that this child remain in Ireland for the school year, nine months out of the year. Which is what had been happening already as the district court carefully lays out in its findings of facts beyond ER-51. So the district court knows the child has spent most of the year in Ireland. I'm not sure how this document changes that. You're saying a different conclusion should have been drawn from that, but it doesn't look like he's got the facts wrong. He didn't mention that the trial, the district court doesn't mention these three facts. So what? He has already recited that the child spends most of the past few years in Ireland. What do these documents prove other than exactly that? The district court doesn't come back. And the district court finds there was no shared intent. From what I can read of that decision or, excuse me, the district court says the last shared intent was in 2010. These documents, I think, I argue to you, show that there was a change of intent. Our job is not to edit district court opinions. Our job is to review for error. So let's say the district court didn't mention these particular documents. What is it that requires a district court to mention particular documents in the record? What is the – if, as Judge Clifton has pointed out, the judge got the facts, obviously understands what the situation is. He describes historical facts. Why does he have to mention – where is it written that he has to mention specific documents? In part, Your Honor, because if Moses is extended beyond its sabbatical, its 15-month time period, then when the district court finds – then the district court goes looking for the last shared parental intent. What the district court does in its long decision, it recites a number of facts that relate to whether she has a permanent residence, whether she has a car in Ireland. But the shared intent test in Moses goes back, makes 3.2 and 3.3 very, very important. But it's very clear he looked at that. He acknowledged this whole pending custody determination. He looked at all the documents. He just draws a different conclusion than you do. As my colleague, God rest his soul, Bill Hilton, who argued Moses in this Court, would point out, the treaty isn't a custody decision. It's a jurisdictional decision. Of course. You don't need to tell me what the treaty says. I mean, in fact, the judge just makes it as a matter of point of what's the status. So we know that custody, that habitual residence doesn't follow custody. But now you're arguing to us that in these custody papers that are going to determine where things sort out in the California courts, that we're supposed to divine from that something different than the district court did. And all I'm – and you think he should have mentioned, and all I'm saying is he acknowledged it, but he doesn't draw the same conclusion you do. I don't know why we have to say that's clearly erroneous. I don't think that he – I don't find in his statement a decision, Your Honor, that he acknowledges these three documents. And there's another problem from the first – He doesn't have to acknowledge each one, but he obviously is aware, as Judge Kuczynski said, I didn't need to edit the opinion, but he's certainly aware of this, of all the documents, and he references the fact that there is this pending determination. So he definitely has that in mind when he draws his final factual conclusion. There's a second problem with that, and that's ACARA. And that's the specific section. ACARA is 42 U.S.C. 11603E, and that has to do with the burden of proof. Congress has told the district courts and the state courts, because these issues are tried more in state courts across the country than in federal courts. 11603E1 says, A petitioner in an action brought under subsection B, the Hague Convention, shall establish by a preponderance of evidence, dot, dot, dot, that the child has been wrongfully removed or retained within the meaning of the convention. Now, Congress was aware that it could change the burden of proof, because it did change the burden of proof with regard to Article 13B, which is the grave risk, and it also changed it with regard to Article 20, which is the fundamental purpose test. And there it made the test clear and convincing evidence. By ignoring these documents, the trial court, the district court, has now said, Ms. Murphy must prove unequivocally that the child has moved. I don't think it said unequivocally she has to prove it. I mean, I don't see what – as I understand your argument, you're now saying that, in effect, the district court collapsed the preponderance test and rose it to clear and convincing, as you might do in a risk situation. So maybe you can point me to where in the district court opinion you think that happened. E.R. 62, the Court's decision, page 13, lines 1 through 4. Quote. I'm sorry. Page 13? E.R. 62. It is page 13 at the mark of the Court's decision. Okay. On which line? I'll start at line 2. Okay. Quote. In the absence of either of these circumstances, however, a prior habitual resident should be deemed supplanted. I'm sorry. There are too many numbers here. I was looking at different page 62. I'm sorry. This is E.R. 62? Yes. I'm sorry. I was looking at page 62 at the top. This is E.R. 62. I'm sorry. I'm with you. At line 2. In the absence? Go ahead. Yes. In the absence of either of these circumstances, however, a prior habitual resident should be deemed supplanted only where and only where and the following appear in italics. The objective facts point unequivocally to this conclusion. But as I understand that quotation, so correct me if I'm wrong, the judge first goes through where is this child's habitual resident, makes a determination that it's the United States, and then says, of course, there are these rare circumstances where we don't really credit that, and we look at the child's socialization and acclimatization to really override that. And that is a rare, unusual case, and that's what the judge is talking about here. Quoting, I thought, from?  Yes. From Moses. So. The Bible. Or the Convention. You know, but so I think that in making the habitual resident's determination at the outset, the judge doesn't up the standard in any way, does he? Partly in his opinion? Partly? I would argue that when the standard is unequivocal, the unequivocal means. Let's go back. When he has Part A, which I think he labels, let me just run back, shared custody and intent, which is basically the habitual resident's touchstone, that's basically a preponderance that she hasn't shown that it was anything different than, you know, the trial period and then the, you know, the carrying on of the trial period. It's only when he's talking about this socialization, this unusual circumstance of acclimatization that he quotes the confidence, unequivocal confidence. Isn't that true? Yes, but that's an excellent segue into is Moses, should Moses be read beyond its sabbatical, meaning Moses as we're in Beverly Hills for 15 months. And there is a split in the circuits, as we now know. This is perhaps the last question that the United States Supreme Court has not answered as far as the Hague Convention is concerned. In the last four years, it has answered the question about what an exeunt order is, what Article III mootness is, and whether or not equitable tolling applies. And if we look at those, and if we look at the Clara itself, the Clara tells us, and those decisions tell us, that interpreting a treaty is different than interpreting a statute and that treaties are to be interpreted consistent with the shared expectations of the contracting parties. That's Lozano at 1-2. You've lost me. I have no idea what you're talking about now. You started by telling us about extending Moses, and now you're on treaties. So I don't know your point. What are you trying to say? That just as other jurisdictions, international jurisdictions... No, not just that. What is the point you're trying to make? Don't tell us who or what or where. What is your point? The takeaway is that Moses' requirement that a child cannot be removed from a country that was the parents' the country of the parents' last shared intent needs to be recalibrated. It also needs to be considered whether or not that rule in Moses... I don't know what you mean by recalibrated. If you think it's wrong, you can file a petition for a bankruptcy hearing, and we can reconsider Moses if a majority of the active judges vote to take it in bank. But we can't overrule Moses, so I don't know what you're exactly saying by recalibrated. It's pretty clear. Moses says on the one point, on the initial point of habitual residence, it's a preponderance standard, and on the question of acclimatization, which is a rare circumstance, it's a current convincing standard or something like that. You know, it's a higher standard. You have a problem with that verbal proof? Yes, I do. Okay. I do because, for example, that opinion is based to some extent on one of the most widely reported cases, Shaw. And Shaw has now been... In Australia, I believe. It was someplace down under. I don't remember Shaw. S-H-A-H, not S-H-A-W. It's a United Kingdom case. But in the last year, the United Kingdom has had to change its approach to habitual residence, and it is now consistent with paragraph 66 of the... Well, if you disagree with Moses, this is not the time to take it up. The time to take it up is when you file an in-bank petition. We're bound by Moses. We can't change it. And so what you need to tell us is something that we can do. Otherwise, if you lose on the Moses point, you file and ask the whole Court to take it up. But it's not helping you today. All right. Let me make sure I have your point. In your view, you think Moses is at odds with the convention? Yes. And it's also at odds with our treaty sister countries. The treaty is in effect in 92 states. The United States has a treaty with 72 of those. This last year, the United Kingdom has abandoned its shared intent and has replaced it with a pure factual evaluation of what the situation is for the parents. And there's really good reasons for that, which I won't go into just now. Well, even if you, you know, the pure factual, I think, even if you take that standard I mean, if you look at what the district court did on acclimatization, it's to basically say there is, there's not enough here to really show acclimatization. That's kind of an ultimate conclusion of the facts based on, you know, he cites Ruiz and basically said this is a lot like the Ruiz case. And that's an excellent point, and it ties in with Judge Clifton's comment about Enbank and Chief Judge Kuczynski's comment about the same thing. This court perhaps can limit Moses to sabbaticals. This is not a sabbatical. This is a case in which the child didn't go to Ireland until nine months after the parents' marriage was over. The move to Ireland occurred with a wholehearted agreement of both parents. The father engaged extensively. Let me just ask you this. Is acclimatization, in your view, a subset of habitual residence, or does it find some freestanding form in the convention? That's difficult to answer. I go back to Chief Judge Kuczynski's footnote 8, which is a reference to the hunting of the snark. It was a very apt literary reference to put into a footnote in this case. It's very difficult to know or to come up with one standard for a three-month-old infant. The standard applied to a five-year-old. The standard applied, as in this case, to an eight-year-old. But my question is, does the convention spell out acclimatization, or is that really a judicial framework to try to understand and how to implement the convention in practice? If you look at Perez-Verrera's paragraph 66. No, just answer my question. Here's my first question. Here's my question again. I'm going to just give it to you, and then you can answer it, and then you can talk all you want about something else. Does the convention spell out a provision for acclimatization separate from habitual residence, or is that a judicially created concept? It does not. It does not. But what it does say, and if we look at the report of Ms. Perez-Verrera at paragraph 66, what she talks about is habitual residence being a factual determination. What Moses does, and why I would argue that Moses needs to be limited to a sabbatical case, is it injects an element into habitual residence of intent. When I hear intent, I think domicile. When you look at the convention, which doesn't define habitual residence, and you look at Ms. Perez-Verrera's paragraph 66, what you see is a pure factual test. And that's what our treaty, our 72 treaty countries, have all gone to. And how is that different from Moses? How is that different? I mean, you have to find habitual residence based on facts. And I thought what Moses said is you've got to sort of look at both parents. I mean, what else is there other than the intention of both parents? Because they have custody of the child, and somehow you have to divine that there is some sort of intent. Somebody has determined that this child's, I mean, you don't look at the child. Often the child is not old enough to have an intent. And certainly most children don't determine their own residence domicile. So what is it about Moses do you think is inconsistent? I mean, I take the fact that under the convention, there's supposed to be a consistent body of law worldwide. And I think we do have an obligation to look at what other countries are doing. And if what we have been doing is inconsistent with that, then perhaps we need to invoke our processes for reconsidering. Moses is not written in stone, so to speak. Thank you. No, but, you know, we're supposed to see. So if there are developments worldwide that call into question what we did, then we certainly want to consider it. And maybe this is an appropriate case for a bank, not for us to decide. But I'm failing to understand what it is that you think Moses got wrong, or what it is that is now being done in other countries that's so inconsistent with what we said should be done, or what the district judge did here. I don't know that Moses got it wrong in sabbatical cases. Moses was a 15-month period in Beverly Hills. This case is a three-year period of an eight-year-old. Well, it's a three-year period where she kept going back and forth. So it's not like she was there for three years in one place, in one house, you know, one school, one set of friends, or all that. This was a child that, you know, from the beginning was supposed to be shuttled back and forth between Ireland and the United States. And while in Ireland, she was in four different places. Part of the time she was taken to, was it the Maldives? In the mountains. In the middle of the school year. And the district judge looked at all of this very carefully. And whatever you think the standards should be, it's hard for me to believe that the district judge, I just don't see what the district judge could have done differently to look at the record thoroughly and make a finding. I mean, it's not a finding that you or your client agree with. But, you know, this happens in every case. Every case we see, one side is happy with what the district judge did, and one side is not happy. Or else you wouldn't be here, right? Right. However. So what's the big problem here? If you sort of, you know, if you think about it. The big problem is the extension of Moses beyond its own facts. And even the court in Moses cautioned about extending Moses beyond its facts. But that's what happens with President. Rui's case. Presidents are always extended beyond the facts, because that's how presidents work. What is it that's actually wrong? What is it that should have happened here that didn't? What should have happened in this case?  Other than saying we should have won. A, the shared intent should have been decided in conjunction with a mention and a review by the district court judge of ER 101, 136, and 146. Secondly, it should have not adopted Moses to the extent that it found there was no shared intent in determining the acclimatization. And in saying that the decision or the burden on Ms. Murphy to return her daughter was unequivocal. I think if Moses, again, Moses I think is very appropriate for the facts that were presented to the court. So your objection in the first, on the finding of habitual residence, is that the district judge didn't mention three documents. That's it? And then you go to acclimatization and you say that's the wrong statement. I think that's what's wrong. Okay. Why don't we hear from the other side and see what they have to say about that. Thank you. Good morning, Your Honors. May it please the court. My name is William Sloan. I'm appearing in pro per. I don't think it would surprise the court to hear that I believe Moses is a decision that is important to the Ninth Circuit. It's important to the jurisprudence on hate convention. And I believe it was applied properly here. Well, as best I can hear understood opposing counsel what he takes issue with in Moses. And, again, I meant what I said. I think we do have an obligation to see what other countries are doing. And if we're out of step, I'm not saying we are. I'm just saying. But I think what he's objecting to, as I understand it correctly, is the second part of Moses, the part dealing with acclimatization. And I think opposing counsel is saying that having a heightened burden of proof for that should be reconsidered. Now, of course, we can't do it here. But do you want to speak to that? Sure. As I understood the argument of counsel, he began with a concern that perhaps the district court had applied the wrong burden of proof. And I just want to clarify that. If you look at ER-60 or, sorry, ER-58, line 14, when he does his initial analysis of habitual residence, he does apply the preponderance of the evidence standard. It's when we turn to the discussion of acclimatization and whether acclimatization of the facts that lead to an evaluation of acclimatization ultimately overcome that initial determination, that is when I believe it was this Court in Moses said that the fact should point unequivocally to a determination that the child is acclimatized. And that was what the district court was quoting. And it's in quotation marks even when he makes his own determination. It's my – it will come as no surprise to this panel that it's my opinion that that is appropriate. When you have the initial determination of habitual residence, which I believe it's important that the parents' mutually shared intent be determined by the courts, that that not be overcome for all of the reasons that have been discussed in all of the cases looking at acclimatization. The concern that a child, you know, God bless our daughter, was doing extremely well in Ireland, that alone should not be enough to suddenly transform the intent of the parents into a scenario where the habitual residence changes. Well, it is – Let me ask you about the reality is there was this trial period. She would go over there and live for a year. And Ms. Murphy would be able to pursue a degree. But one year turned into what, two? And then two turned into three. Why is that? I mean, that does not seem to really be consistent with the trial period idea at the outset. So it seems to be that there might have been a trial period to begin, but then that may have changed. And I appreciate your comments on that. There's no question that the passage of time was a great concern of mine. It was certainly examined at the district court level. When Ms. Murphy approached me to consider trying this arrangement where our daughter would be in Ireland, it was, from my perspective, she obviously had a different perspective, very clear that it was going to be a trial period. Much of that had to do with my ability to be a part of her life. And as I think the facts played out and as are reflected to some extent in the district court's decision, that became more and more difficult over time. And that is when ultimately the trial period concluded. I indicated to Ms. Murphy that our daughter would be coming back here, and ultimately then she filed the hate petition. It's still one of my greatest regrets that we're in the courts dealing with this. Well, is there a limit to how long a trial period can last and still be a trial? I mean, you test drive a car, they may let you take it overnight, but if you still got it a couple months later, that's probably not a test drive. In this case, it was a one-year or a one-school year, and then it went to another and then another, and based on the proposed custody arrangements, was expected to continue indefinitely like that. So why is that past a trial? Why isn't that past a trial period? Well, I think that's a very fair question, and ultimately I believe the courts have addressed this by saying ultimately it's not appropriate to place some sort of bright-line time on these things. You do consider, or the court will consider, the totality of the circumstances. There may be one case where one year is enough, and there may be another case, like ours happened to be here, where three years was not enough. In this situation, we didn't have two parents moving to a different place. I stayed in California. Ms. Murphy moved to Ireland. Our daughter did come and spend considerable time with me throughout that period. And ultimately the court determined that the, you know, that the totality of the facts and the circumstances did not result in a change of habitual residence. There could be another case where maybe even six months is enough. And so the notion that we apply some sort of a timeline threshold really would constrict the courts in a way that would prevent them from making the determination of the facts. Just to follow up on what I understand to be Judge Clifton's question, or the purport of it, the time period weighs in two ways. One of them is, of course, the longer she is at the other location, the more you could have acclimatization. And that's governed by the higher standard and so on. But also the longer, sorry, weighs on that, but also the longer she spends time over there, the more there is support for the idea that perhaps the parents had a changed intent. That somewhere along the way, if you just let it go enough for a long enough time, even though they didn't put in writing, even though their initial agreement was that this would be a trial period, at some point it's extended far enough in time, we can say, well, tacitly, perhaps, the parents have now agreed that it's no longer going to be California, it's going to be Ireland, that child's habitual residence. And, you know, it's a little troubling. And three years is a long time in the child's life. How old was E.S. when she left us? She was five, five and a half. So she's half again, more than half again as old, right? And if you sort of think of, I don't know how far back children remember, but I don't have memories beyond three years old or four years old. That's most of her life, really. Yeah. No, I understand. And it's a... And you think that this big judge looked at all of that and made findings and that's it? Well, and I appreciated your comment in the last oral argument that sometimes it's appropriate to just read from opinions. And it so happens I believe Moses speaks precisely to this issue. And it says, Other times, however, circumstances are such that even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred. Clearly, this is one of those questions of, quote, historical and narrative facts, unquote, in which the findings of the district court are entitled to great deference. And Moses was citing the Fetter decision in that quote. And, again, I think it all stems initially from the convention itself, the Perez-Vera report, which says ultimately this is a question of fact. And we have lots of jurisprudence that says we should resist applying technical, rigid rules that will ultimately determine these cases because each case is different. Yeah. It puts everyone in a difficult situation, of course. Your option would have been to invoke the convention earlier while the child was in Ireland. But, on the other hand, I understand the, you know, underlying desire not to necessarily resolve things, you know, via the courts. Is there anything in the record beyond this, you know, now we're going on a trial period, that you would point to that suggests that you intended she come back to the United States and that you were going to kind of live and let live during the Ireland time, but you weren't going to be hard fast on the date? I mean, is there anything beyond those initial statements that we should look to in the record to see whether the district court made a factual error? Well, I did point out in my brief and did point out to the district court, for example, when counsel was raising the issue of the proposed settlement agreement, there were a few points that I made. When it came up in the district court, I started with my general understanding that settlement agreements typically are not used as evidence, but they were introduced here, and I decided I'd rather speak to them than try to just have them removed from the record. And what I pointed out was that was a draft, and there was a subsequent draft where the language was removed about where ultimately our daughter would live. And that ultimately reflected things that I testified to, which, and placed in my declaration, which was that Ms. Murphy was not prepared to say that she would live in Ireland. And that was my declaration. I know she had a different. Do we have that amended draft or no? I do. Do we have it in the record? You do. Okay. And it's in the supplemental excerpts of record. My declaration cites it at pages 50 and 51 of the supplemental ER. And then the actual draft is found at supplemental excerpts of record 173 through 178. I presented both the original and the supplemental. I'm sorry. 173 to 178? Yes. And, again, that's the SER, not the ER. All right. Thank you. That's Exhibit 38 starts at 173. And I believe it's the February draft first and then the later draft after it, just the word. Except the February 2013 draft. All right. Okay. I think we're on the same page. So I suppose the only other point that I would make is that there was discussion about the Ruiz case, and I do not interpret that as critical to the Court's ultimate determination. But I do believe it reflected another case where time, if a strict time limit were imposed, it would create, it would create. Oops. That's the first time I've ever seen that. Usually we tell you to turn up with your alarm. Yeah. I use it as a wake-up alarm. Unfortunately, not needed for this case. There have been cases where it would be useful. Well, all I wanted to say is the Ruiz case, in my mind, is an example of another scenario where the Court needed the flexibility to reach the decision that it reached without being constrained by some sort of hard and fast time limit. So to that extent, I feel like it's useful, and I feel like it reflects. And, in fact, it does reflect that Moses is a decision that has had a very influential course in many, if not all, of the circuits, as well as jurisdictions outside of the United States. So with that, I believe that the district court reached a sound decision. It considered the totality of the circumstances. It applied the appropriate burdens. And for all those reasons, I believe that that decision should be affirmed. If there have been any other questions. Thank you. Thank you. Well, you've taken more than your time. If you wish a minute for rebuttal, you can take it. I think we understand the case. Thank you. I'd like to answer both Judge Clifton and Judge McAllen's question to Mr. Sloan. Is there anything else in the record that we should look at? And I would direct the Court's attention to page 93 of the trial transcript. And where is that in the ER? I'm sorry? Is that in the excerpt of record? Is that in the excerpt of record? I don't believe so. At page 94, excuse me, 93, 94 to 95, Mr. Sloan talks about. This is not in the excerpt of record? I don't believe so. Is it in the district court record, or is it just a transcript you have? I believe it is. We only have access to the district court record. We don't have access to, if it's not filed as a document. I can't swear that it's in the district court record. I believe it is. They have a little piece of paper here that you can make a supplemental notation, and if you can point as to where it is in the district court record, that would be helpful. All right. May I have until the end of the day to do that? Sure. Thank you. Okay. Thank you. And I'll serve that on Mr. Sloan as well. Okay. I would just add that you're out of time. Thank you. Thank you. Occasional arguments stand submitted. And we also thank the Court and Mr. Sloan for agreeing to expedite this matter. We are here very quickly, and Ms. Murphy appreciates that greatly. Of course. Thank you.
judges: KOZINSKI, McKEOWN, CLIFTON